**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 10-7-DLB-CJS**

**KENNETH ROBIE**                                                               **PLAINTIFF**

**vs.**                              **MEMORANDUM OPINION AND ORDER**

**SOUTHERN MARINE**
**CONSTRUCTION COMPANY, ET AL.**                              **DEFENDANT**

* * * * * * * * * * * * * * * * *

Plaintiff Kenneth Robie commenced this action against his employer, Defendant Southern Marine Construction Company, for allegedly breaching its duty of reasonable care as a vessel owner to provide him a safe place to work while aboard its barge. According to Plaintiff, he fell through the hull of Barge Vessel 1087 as a direct and proximate result of the negligence of Southern Marine. The Court has maritime jurisdiction over the claim pursuant to 28 U.S.C. § 1333.

This matter is before the Court on cross-motions for summary judgment (Docs. # 80 and 84). These motions have been fully briefed (Docs. # 85, 94, 95, and 103), and on January 4, 2013, the Court heard oral argument on the motions. At the close of the hearing, the motions were submitted for decision. For the reasons set forth below, Defendant's motion is hereby **granted**, while Plaintiff's motion is **denied**.

I.      **BACKGROUND**

This case stems from an accident that occurred on January 29, 2007 in which

1

Plaintiff Kenneth Robie fell through the hull of a barge owned by Defendant Southern Marine Construction Company.

### A.    The Parties

At that time of the accident, Southern Marine was engaged in a construction project, known as the "Lone Star" project, building a large cylindrical mooring structure, called a "cell," in the Ohio River.  This involved placing a circular steel template in the river and then securing sheet metal around the template to form the perimeter of the cell.  (Doc. # 69-1, at 21, 35-39).  In support of this project, Southern Marine provided a twin screw towboat that it owned, the M/V J. E. POTTER, and attached Barge Vessel 1087.

Plaintiff began his career as a concrete finisher and was initially hired by Southern Marine in that capacity, and was thereafter offered a job as a carpenter.  (*Id.* at 14, 18-19). He did not have any maritime training or experience as a deckhand, and he did not have a pilot's license or Coast Guard certification.  (*Id.* at 21-22).

With respect to the "Lone Star" project, Plaintiff primarily performed construction work and welding.  (*Id.* at 24).  While performing most of his work, Plaintiff was located on the template, although he occasionally welded and did other tasks while physically aboard Barge Vessel 1087, which was moored to the cell for an extended period of time.  (*Id.* at 40).

### B.    The Hazardous Condition

The basement area of Barge Vessel 1087 was used to store old construction equipment, tools, and hardware.  (*Id.* at 43-44).  Plaintiff became familiar with the condition of the basement during the previous "Mountaineer" project.  (*Id.* at 43-50).  Toward the end

2

of that project, Rodney Lemons, a construction superintendent on the job sites and Plaintiff's supervisor, sent Plaintiff into the basement to dispose of rusted material.  (Doc. # 69-1, at 29, 43-45); (Doc. # 70-1, at 10-11, 32).

While disposing of this material, Plaintiff noticed that the structural beams in the basement were covered with a layer of plywood that served as the floor surface.  (Doc. # 69-1, at 46).  Over time, part of the plywood flooring had weakened and deteriorated, which made it difficult to walk in the area.  (*Id.* at 45-46).

### C.    The Accident

Plaintiff was subsequently given time off, as the barge had to be moved from the "Mountaineer" project to the "Lone Star" project.  (*Id.* at 53).  On the date of the accident, the "Lone Star" project was nearing completion,[1] so Plaintiff began gathering and storing welding leads in the basement area of Barge Vessel 1087 to ensure they were not stolen or lost when the vessel moved to the next project.  (*Id.* at 57-58, 81).

According to Plaintiff, this task was initiated by Rodney Lemons, who told him to store the leads in the basement.  (Doc. # 69-1,  at 60-61).  Southern Marine, though, has submitted evidence to the contrary, as Lemons and Jim Davis, another supervisor, testified that Plaintiff was ultimately instructed to store the leads in the gang box above the deck, and not to go into the basement.  (Doc. # 70-1, at 67-68, 76, 81); (Doc. # 72-1, at 29-31,

---

[1]  Plaintiff contends that "no construction work was being performed on the date Plaintiff was injured," so the "Lone Star" project was actually finished.  (Doc. # 95, at 2).  This contention, though, is contradicted by Plaintiff's testimony that the project was "finishing up"–not that it had already ended.  (Doc. # 69-1, at 57, 81).  He further testified that Southern Marine's crane operator was not present when the accident occurred because he was still performing excavation duties, (*Id.* at 60-61), and that his co-workers were unable to hear his calls for help because "the crane was running.  I think there was a couple of pumps running, and things like that . . . ."  (*Id.* at 71).

45).

Despite this factual discrepancy, it is uncontested that Plaintiff took one lead on each shoulder, walked across the deck of the barge, and then stepped down the stairs into the basement area.  (*Id.* at 63-65).  Once in the basement, he attempted to step on the metal beams, but his foot went through the plywood flooring, causing him to fall and strike his lower back on one of the floor beams.  (*Id.* at 65-71).  As a result, Plaintiff suffered a disc protrusion with associated disc collapse, and underwent several surgeries, including a laminectomy, a spinal fusion, and placement of a spinal cord stimular.  (*Id.* at 65-71, 94-95).

### D.    Procedural Posture

In light of the foregoing, Plaintiff commenced this action against Southern Marine for allegedly breaching its duty of reasonable care as a vessel owner to provide Plaintiff a safe place to work while aboard its barge.  Discovery having since been completed, both parties have now moved for summary judgment.  (Docs. # 80 and 84).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Accordingly, in deciding a motion for summary judgment, courts must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

As is clear from the face of Rule 56, the "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532

4

F.3d 469, 483 (6th Cir. 2008) (citation omitted).  Once the movant has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  Rather, the nonmoving party must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

## III.   THE DUAL CAPACITY DEFENDANT

For the reasons explained in this Court's prior Memorandum Order (Doc. # 121) denying Plaintiff's Motion to Strike Defendant's Dual Capacity Defense (Doc. # 96), an employee such as Plaintiff can maintain separate actions for worker's compensation and negligence against vessel owners who are also their employers.  *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983).  In making this determination, the Supreme Court gave life to the notion of a "dual capacity" defendant and, in so doing, implied that courts must determine whether the negligent actions of such a defendant "were undertaken in pursuance of [its] role as vessel owner or as employer."  *Gravatt v. City of New York*, 226 F.3d 108, 125 (2d Cir. 2000); *see also Morehead v. Atkinson-Kiewit, J/V*, 97 F.3d 603, 608 (1st Cir. 1996) (recognizing that a plaintiff must show that any negligence on the part of a defendant is attributable to it as a vessel owner rather than as his employer); *Castorina v. Lykes Bros. S.S. Co., Inc.*, 758 F.2d 1025, 1033 (5th Cir. 1985) ("This scheme of compensation requires us to separate the negligence of the shipowner and that of the

stevedore, even when the shipowner performs its own stevedoring activities.").

It is undisputed that Southern Marine was both the owner of the barge and Plaintiff's employer at the time of his injury, so the company has been properly characterized as a "dual capacity" defendant by both parties.  Unfortunately, the Supreme Court "has not yet explained how to distinguish between the employer responsibility and the vessel responsibility" in the "dual capacity" context.  *Gravatt*, 226 F.3d at 121 (citation omitted); *see also Morehead*, 97 F.3d at 605 ("While the Supreme Court has endorsed the bringing of section 905(b) negligence actions against a dual capacity defendant in its vessel owner capacity, the Court has yet to define, in such a case, the point at which employer responsibility ends and vessel responsibility begins.").  That being said, the Court of Appeals in the First, Second and Fifth Circuits have addressed this issue in *Morehead*, *Gravatt*, and *Castorina*, respectively, and two of these cases have been favorably cited by the Sixth Circuit, albeit it in unpublished opinions.  *See DeArmond v. Southwire Co.*, 109 F. App'x 722 (6th Cir. 2004) (citing *Gravatt*); *Dietlin v. U.S. Steel Corp.*, 779 F.2d 50 (6th Cir. 1985) (citing *Castorina*); *see also Bentley v. L & M Lignos Enter.,* No. 1:06 CV 1832, 2007 WL 2780897, at *4-5 (N.D. Ohio Sept. 24, 2007) (discussing and applying *Morehead*).

Because the Sixth Circuit has relied upon these cases, this Court will follow the analytical framework set forth in *Morehead*, *Gravatt*, and *Castorina*.  However, before outlining those cases, it is important to generally understand a vessel owner's responsibility to workers onboard his ship.  This means pausing to review the Supreme Court's decision in *Scindia Steam Navigation Company, Ltd. v. De Los Santos*, 451 U.S. 156 (1981), which

6

addressed the typical situation where the employer and the shipowner are separate entities.

### A.   The *Scindia* Decision

In *Scindia*, the Supreme Court "examined the issue of a vessel's duties of care under § 905(b) in the context of the classic triangular relationship among a vessel owner, an independent stevedoring contractor and an injured longshore worker employed by the stevedore" and, in so doing, "held that limiting the vessel's duty of care so as to put the chief responsibility upon the independent stevedore was consistent with Congress' intent to permit third-party negligence actions against the vessel but to eliminate the vessel's no-fault liability under the unseaworthiness doctrine."   1 The Law of Maritime Personal Injuries § 8:23 (5th ed. 2012).   For this reason, the court "articulated three duties, now commonly known as the *Scindia* duties, that define the scope of a vessel's duty of care owed to longshore workers under § 905(b) in the classic tripartite situation: (1) the turnover duty; (2) the active control or active operations duty; and (3) the duty to intervene."   *Id.* (footnoting *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92 (1994)).   These duties are defined as follows:

> Under the turnover duty, which relates to the condition of the vessel at the commencement of stevedoring operations, before turning over any portion of the vessel to the stevedore the vessel owner must exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." As part of this duty, the vessel owner must also warn the stevedore of hidden dangers that could not be discovered through the exercise of reasonable care.
>
> The second duty, active control duty, which applies once stevedoring operations have begun, requires that the vessel owner "must exercise

7

reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel.  Also, once stevedoring operations have begun, the vessel will be also liable "if it actively involves itself in the cargo operations and negligently injures a longshoreman."

The third duty, duty to intervene, is an exception to the generally limited duty imposed on the vessel once operations have begun.  With respect to obvious dangers in areas under the principal control of the stevedore, the vessel owner must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore is not exercising reasonable care to protect its employees from that risk and (3) the stevedore's decision not to remedy the developing hazard is "obviously improvident."

*Id.*

Although the Supreme Court has set forth a fairly coherent analytical framework with respect to the typical triangular relationship among a vessel owner, an independent stevedoring contractor and an injured longshore worker employed by the stevedore, two issues remain unresolved by the Supreme Court.  First, as noted, the Court has not yet explained how to distinguish between employer responsibility and vessel responsibility in the "dual capacity" context.  *See Gravatt, supra*.  Moreover, "the Court [has not] yet explained how the principles it set out in *Scindia* apply to claims brought by non-stevedoring harbor workers covered under the [compensation scheme] against a vessel owned by their own employer."[2]  *Gravatt*, 226 F.3d 108 at 121.  Fortunately, *Castorina, Morehead*, and *Gravatt* resolve both of these issues.

**B.     *Castorina*, *Morehead*, and *Gravatt***

The first circuit to confront at least one of these issues was the Fifth Circuit via its decision in *Castorina*.  In that case, the court concluded that "the duty owed by a shipowner

---

[2]  The parties agree that Plaintiff was a non-stevedoring harbor worker.

to a longshoreman . . . is that established by *Scindia* and its progeny" and "is neither heightened nor diminished when the longshoreman is employed directly by the vessel." 758 F.2d at 1033.  The court then noted that courts must "separate the negligence of the shipowner and that of the stevedore, even when the shipowner performs its own stevedoring activities." *Id.* at 1033.

The Fifth Circuit's decision in *Castorina* was the forerunner to the First Circuit's subsequent decision in *Morehead*.  In that case, the First Circuit generally agreed with the analytical approach laid out by the Fifth Circuit and suggested that courts should divide the "dual capacity" defendant into a hypothetical independent employer and independent vessel owner in furtherance of that approach, but cautioned that the *Scindia* duties may not always neatly apply to harbor workers:

> We agree with the Fifth Circuit, for similar reasons, that the duties of care described in *Scindia* should be applied in dual capacity cases insofar as the facts allow.  To do so, a court may have to divide the employer-shipowner into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in *Scindia*. . . .  On occasion, however, the duties and work arrangements pertaining to a suing harbor worker may be so foreign to those in *Scindia*'s stevedoring context that *Scindia*'s analysis will become no more than a point of departure.  Nonetheless, *Scindia*'s general approach, at least, can be followed and, in many cases, some or all of its express analysis may be useable.

97 F.3d at 613.  Because "*Scindia* will sometimes afford less direct guidance on those duties owed to harbor workers than it does on those owed to longshore workers," the court recognized that federal district courts must "decide, on a case-specific basis, whether the harbor worker's employment arrangement sufficiently resembles that in *Scindia* to make particular specifics germane."  *Id.*

9

Most recently, the Second Circuit relied upon *Castorina* and *Morehead* in crafting its decision in *Gravatt*. In that case, the court first acknowledged that "lower federal courts have generally held that *Scindia* provides the appropriate point of departure for analyzing a vessel's liability in a section 905(b) action brought by non-longshoring harbor workers." 226 F.3d at 122 (citations omitted). Moreover, upon concluding that the "dual capacity" defendant therein was not negligent in its capacity as vessel owner, the court then commented that "[t]he employer's immunity from liability in tort for its negligence is the rule established by section 905(a), while an employee's ability to recover from the vessel under section 905(b) is the exception." *Id.* at at 126 (citations omitted).

The decisions of the First, Second and Fifth Circuits set forth several basic principles that are of particular importance in this case. First, the three *Scindia* duties are generally the appropriate point of departure for analyzing a vessel owner's liability in an action brought by a harbor worker. In this case, there is no reason to deviate from these duties, especially since both parties exclusively focused on them in their briefing. Second, to distinguish between employer responsibility and vessel responsibility, courts should divide the employer-shipowner into a hypothetical independent employer and independent vessel owner. Finally, and perhaps most importantly, the employer's immunity from liability in tort for its negligence is the rule, while an employee's ability to recover from the vessel owner is the exception.

With these principles in mind, the Court can now properly address the parties' motions.

## IV.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.     Turnover Duty

As noted, the turnover duty relates to the condition of the ship upon the commencement of harbor work operations and places two responsibilities on the vessel owner:

> (1) To exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced employer can carry on operations with reasonable safety to persons and property; and
>
> (2) To warn of latent or hidden dangers which are known to the vessel owner or should have been known to it in the exercise of reasonable care.

Although the parties' written memoranda blurred these responsibilities, this case is confined to the first responsibility, i.e., the responsibility of safe condition.

The responsibility of safe condition does not require the ship owner to turnover an absolutely safe vessel; the ship owner need only exercise reasonable care, as the standard presumes a reasonably expert and experienced employer.  *See Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1207-1208 (9th Cir. 1989); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1039 n.12 (5th Cir. 1983); *Jupitz v. Nat'l Shipping Co. of Saudi Arabia*, 730 F. Supp. 1358, 1362 (D. Md. 1990).  This rule derives from the Supreme Court's repeated exhortation that, "[a]s a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards."  *Scindia*, 451 U.S. at 170.

Because the turnover duty does not require an absolutely safe ship, it follows that "certain dangers that may be hazardous to unskilled persons need not be remedied if an expert and experienced [employer] could safely work around them."  *Bjaranson*, 873 F.2d

11

at 1208; *see also Kirsch v. Plovidba*, 971 F.2d 1026, 1029-1030 (3d Cir. 1992) (agreeing with *Bjaranson*).  With this in mind, Plaintiff must do more than point to a hazardous condition; it is his obligation to "introduce evidence that the hazard was such that an expert and experienced [employer] would not 'be able by the exercise of reasonable care to carry on its . . . operations with reasonable safety to persons and property.'" *Bjaranson*, 873 F.2d at 1208 (quoting *Scindia*, 451 U.S. at 167); *see also Jupitz*, 730 F. Supp. at 1361 (recognizing that a plaintiff must show an *unreasonably* hazardous condition).

Having set forth the relevant portion of the turnover duty, the question then becomes: Is the weakened and deteriorated plywood flooring in the barge basement, which was obvious and known, the kind of hazard that a construction company should have reasonably been expected to cope with safely during the course of performing its operations?  *Jupitz*, 730 F. Supp. at 1362.  In the absence of controlling Sixth Circuit authority, four decisions from the Ninth Circuit are particularly instructive.

### 1.    Ninth Circuit Case Law

In *Bjaranson v. Botelho Shipping Corporation, Manila*, 873 F.2d at 1205-1206, a longshoreman was injured when he attempted to descend a "coaming ladder" of a hatch and fell to the deck due to poor lighting.  On review, the Ninth Circuit held that the plaintiff failed to make his "additional showing," i.e., failed to set forth evidence that either the ladder or the hatch "was such that an expert and experienced stevedore would not 'be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property.'" *Id.* at 1208.  In fact, rather than establishing negligence, the court noted that "the evidence in this case supports the conclusion that an expert and

12

experienced stevedore could have safely conducted the cargo operation" for several reasons:

> The crane could have been moved by simply making a verbal or visual contact with the crane operator. Or, if the operator had been warned not to move the crane, the men, according to the testimony, could have squeezed around the leg of the crane. Furthermore, the crane itself provided an alternative means of descent from the hatch top. From this evidence it is apparent that all that was required to eliminate in its entirety any arguable hazard was movement of the crane. Such circumstances cannot give rise to a breach of the duty of safe condition.

*Id.*

The Ninth Circuit's decision in *Bjaranson* was the forerunner to its subsequent decision in *Martinez v. Korea Shipping Corp., Ltd.*, 903 F.2d 606 (9th Cir. 1990). In that case, a longshoreman sustained serious back injuries when he fell through a ladder opening, which was neither covered nor surrounded by a guard rail. *Id.* at 607. On review, the court held that material issues of fact existed with regard to the defendant's responsibility of safe condition and, in so doing, noted that "[t]he fact that the ladder opening was obvious . . . does not necessarily preclude a finding of shipowner negligence" because "the obviousness of the defect does not absolve the vessel owner of its duty to turn over the ship in a condition under which expert and experience stevedores can operate safely." *Id.* at 609-610 (citing *Scindia*, 451 U.S. at 167).

The Ninth Circuit thereafter reconciled any confusion as to *Bjaranson* and *Martinez* via its decisions in *Ludwig v. Pan Ocean Shipping Co., Ltd.*, 941 F.2d 849 (9th Cir. 1991) and *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266 (9th Cir. 1994). In *Ludwig*, a longshoreman was injured while working aboard a vessel when he stepped down from a ladder onto snatch blocks nestled in a coiled lashing cable located at the bottom of the

ladder. 941 F.2d at 850. On review, the court reiterated that the obviousness of a hazard is not dispositive of whether a vessel owner abdicated its responsibility of safe condition, but nonetheless held that the defendant had not breached the turnover duty. *Id.* at 851-852. This was because the factual circumstances underlying *Ludwig* were more similar to *Bjaranson* than *Martinez*:

> In some cases, we have seen that reasonable factfinders may differ over whether an obvious hazard presents an unreasonably dangerous work environment. *See [Martinez]*. In other cases, an obvious hazard can be removed or avoided easily enough that its presence cannot constitute a breach of the duty of safe condition. *See Bjaranson*[].
>
> . . . .
>
> There was evidence that the hazard created by the coiled cable and snatch blocks could have been rectified by removal. Some evidence indicated this could have been accomplished in a matter of minutes. Other evidence suggested that removal might have taken fifteen to twenty minutes.
>
> This factual question requires no resolution. Ludwig offered no evidence that he was under any time or supervisory pressure that precluded him from seeing to its removal.[3] The uncontested facts indicate the opposite, for when his accident occurred he had stopped work and was en route to speak to the foreman about a different safety problem. He failed to carry his burden of showing that the circumstances made safer alternatives unduly impractical or time consuming.

*Id.* (some citations omitted).

In *Thomas*, a longshore worker was injured after she fell through a hatch opening,

---

[3] This factor–whether the employee was under any time or supervisory pressure precluding him from removing or avoiding a hazard–may be misstated, at least with respect to supervisory pressure from his employer. If such pressure existed, this would only tend to show employer liability–not vessel owner liability–unless the vessel owner knew or should have known of such pressure. *Cf. Kirsch*, 971 F.2d at 1033 ("[The longshoreman] would be able to defeat summary judgment if he could offer evidence that, in light of custom between [the vessel owner] and [the stevedore] (or at that port or in this industry), [the vessel owner] would have acted unreasonably to assume that [the stevedore's] workers would avoid the danger.").

which was completely uncovered and unguarded. 42 F.3d at 1268. On review, the court held that material issues of fact existed with regard to the defendant's responsibility of safe condition, primarily because the plaintiff disclosed an expert witness who made the following declarations: (1) The presence of an unguarded, uncovered deck opening or manhole positioned within two feet of the bottom of an access ladder was an extremely unusual and hazardous condition: (2) It was customary for a vessel to have in place over all deck openings or manholes either a properly functioning manhole cover or a barricade of some sort such as a large piece of plywood or a chain-type railing; and (3) The condition would not have been something that even an experienced longshore worker would have looked for or anticipated. *Id.* at 1269-1270. The court also rejected the defendant's argument that it could not have breached its responsibility because the condition was "easily avoidable":

> The question whether a hazard is easily avoidable is simply part of the larger question whether a hazard is unreasonably dangerous. It is the failure to eliminate an unreasonably dangerous hazard that constitutes a breach of the vessel's turnover duty of safe condition. In determining whether a particular hazard is unreasonably dangerous, the fact finder must examine the totality of the factual circumstances surrounding the hazard and the accident and consider them as a whole. Although the avoidability of the hazard is relevant to whether the hazard was unreasonably dangerous, it is not necessarily determinative. There may be circumstances in which a hazard can be easily avoided but some other factors present make it nonetheless unreasonably dangerous.

*Id.* at 1270-1271 (citation omitted) (footnote omitted). Most importantly, the court distinguished the factual circumstances underlying *Bjaranson* and *Ludwig*:

> In *Ludwig* the plaintiff had actual knowledge of the danger and simply forgot about it. In *Bjaranson*, the plaintiff deliberately elected to forego the safer alternatives of asking the crane operator to move the obstructing crane or squeezing past the crane leg. Rather, he consciously chose to scale across the crane and attempt to descend down a partial ladder not intended for that

15

purpose. . . .  The hazardous circumstances here are clearly factually distinguishable from those cases, and others relied on by Newton, in which courts have held the hazardous situations to be "easily avoidable."  That Thomas could have stepped in a different direction and "easily avoided" the hazard is not enough to permit Newton to avoid the imposition of liability-not if, as Kuvakas' declaration suggests, Thomas would not reasonably, through the exercise of reasonable caution, have anticipated the hazard.

*Id.* at 1272.

These decisions, much like those of the First, Second and Fifth Circuits, set forth several basic principles pertinent to this case.  At the outset, the obviousness of a hazard is not necessarily dispositive of whether a vessel owner abdicated its responsibility of safe condition.  Rather, courts must consider the totality of the circumstances surrounding the hazard and the accident as a whole.  However, this analytical framework does not absolve the plaintiff of his burden of showing that the circumstances made safer alternatives unduly impractical or time consuming.

### 2.    Analysis

As explained in *Morehead*, analysis of whether Southern Marine breached any duty must begin by dividing the company into a hypothetical independent employer and independent vessel owner.  Here, it is uncontested that Southern Marine qua vessel owner moved Barge Vessel 1087 from the "Mountaineer" project to the "Lone Star" project, and then turned over the barge to Southern Marine qua employer with its basement in poor condition.  The parties dispute whether the weakened and deteriorated plywood flooring, which was obvious and known to Southern Marine qua employer and its employees (including Plaintiff), was the kind of hazard the employer and its workers would reasonably be expected to cope with safely during the course of performing their operations.

Plaintiff's primary argument analogizes the condition of the basement to a stray

16

banana peel.  Specifically, Plaintiff contends that, if a person slipped and fell on a banana peel that had been left on the floor for several days, then it would be fair to characterize the act of leaving the peel as the act constituting the breach of care.  According to Plaintiff, the decision of Southern Marine qua vessel owner to turnover the barge with the basement in poor condition can thus fairly be characterized as a breach.

In support of his "banana peel" theory, Plaintiff disclosed Larry Liberatore as his expert witness, who testified that the condition of the basement violated the Occupational Safety and Health (OSHA) regulation pertaining to the structural integrity of walking or working surfaces at construction sites.[4]   (Doc. # 77-1, at 78-80, 90-92).   However, Liberatore acknowledged that his opinion was limited to whether the condition violated an OSHA regulation; it was not a "big picture best practice type of analysis."  (*Id.* at 104).

At the outset, the Court will assume, without deciding, that the OSHA regulations apply to Southern Marine qua vessel owner.[5]  However, even making that assumption and viewing the evidence in the light most favorable to Plaintiff, he has failed to provide any evidence that Southern Marine qua vessel owner acted unreasonably under the

---

[4]  This regulation provides that "[t]he employer shall determine if the walking/working surfaces on which its employees are to work have the strength and structural integrity to support employees safely. Employees shall be allowed to work on those surfaces only when the surfaces have the requisite strength and structural integrity." 29 C.F.R. § 1926.501(a)(2).

[5]  To justify his reliance upon the OSHA codes and regulations, Plaintiff refers to the decisions of the Supreme Court of Kentucky and the Sixth Circuit in *Hargis v. Baize*, 168 S.W.3d 36 (Ky. 2005) and *Williams v. J.I. Case Co.*, No. 91-5706, 1992 WL 111809 (6th Cir. May 22, 1992), respectively.  It is unclear how either of these cases support his position, but the Court has found two cases that arguably provide such justification. *See Ollestad v. Greenville S.S. Corp.,* 738 F.2d 1049, 1052 (9th Cir. 1984) (concluding that the district court did not err in instructing the jury that it could consider OSHA regulations in determining whether a condition breached the turnover duty); *Subingsubing v. Reardon Smith Line, Ltd.*, 682 F.2d 779, 780 (9th Cir. 1982) ("Although the [OSHA regulations] impose a duty on stevedores, there is no reason to suppose that it is an exclusive duty.").

circumstances presented.

While it is true that a breach of the turnover duty must occur at the moment of turnover, Plaintiff's "banana peel" theory fails because the turnover duty of reasonable safety requires an "additional showing" beyond pointing to a hazardous condition. *See Bjaranson*, *supra*. Again, the turnover duty requires Plaintiff to put forth evidence that the obvious and known condition of the flooring was *not* the kind of hazard that a construction company may reasonably be expected to cope with safely during the course of performing its operations. *See Jupitz, supra*. Here, Plaintiff himself had not only coped with the condition for approximately three weeks until the "Lone Star" project was nearing completion, he was never injured during the entirety of the earlier "Mountaineer" project.

Similar to *Ludwig*, the condition of the flooring was obvious and known to Plaintiff, yet he has failed to offer any evidence that he was under any time or supervisory pressure that precluded him from storing the welding leads in the gang box above the deck rather than in the basement. Plaintiff might argue that he was directed by his supervisor to store the leads in the basement, and that he was simply following instructions. However, this fact, without more, does not establish that there would be any repercussion for storing the items in an alternative location.[6] *See Jupitz*, 730 F. Supp at 1363 (holding that the question of whether a hazard is such that a worker must take so long as to risk reprimand from the employer is a factor in determining the unreasonableness of the hazard).

---

[6] As noted, supervisory pressure speaks to employer liability–not vessel owner liability–unless the vessel owner knew or should have known of such pressure, and there is no evidence to that effect in this case. *See supra* note 4. The more appropriate question, then, is whether the vessel owner provided an alternative location to store the leads, and the uncontested evidence in this case is that material could have been stored in the gang box above the deck.

Furthermore, unlike *Thomas*, Plaintiff has presented no expert witness to testify as to whether the flooring would have been something that an expert and experienced harbor worker would have been able to cope with safely;[7] as Liberatore admitted, his analysis solely focused on whether the condition of the floor violated an OSHA regulation.  Plaintiff would presumably respond that he was never advised of the "dual capacity defense" and therefore never tried to obtain such an expert, as he raised lack of such notification at the oral argument.  However, this Court has already entered an order denying Plaintiff's Motion to Strike Defendant's Dual Capacity Defense (Doc. # 96), and in so doing effectively resolved this issue.  (Doc. # 121).

In summary, Plaintiff has, at most, pointed to the weakened and deteriorated flooring, but such a showing only establishes that there was a hazard, which is insufficient. Plaintiff has not made his "additional showing," so summary judgment must be entered in Southern Marine's favor.

**B.    Other Duties**

Once a vessel owner turns over a ship in a reasonably safe condition, it generally owes a harbor worker no other duty, as the employer would then assume responsibility for safety of the vessel.  *See Morehead*, 97 F.3d at 613 ("The *Scindia* Court reasoned that once longshore workers came aboard and began carrying out their cargo duties under a stevedore's supervision, the vessel itself had no general duty to exercise reasonable care to inspect for unsafe workplace conditions; rather, it could rely on the longshore worker's

---

[7]  This does not mean that Plaintiff was obligated to provide an expert, but rather as an example of how he could have satisfied the "additional showing" requirement enunciated in *Bjaranson*.

employer to do so.") (citation omitted).  There are, however, two exceptions to this general rule–the active control duty and the duty to intervene:

> (1) The vessel owner must exercise reasonable care to prevent injuries to harbor workers in areas that remain under the active control of the vessel; and
>
> (2) The vessel owner must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the employer is not exercising reasonable care to protect its employees from that risk and (3) the employer's decision not to remedy the developing hazard is "obviously improvident."

As a corollary to the first exception, the vessel owner will also be liable if it actively involves itself in the cargo operations and negligently injures a harbor worker.  Furthermore, the second exception only concerns dangerous conditions that arise *after* the vessel has been turned over to the employer.  *See Scindia*, 451 U.S. at 175 (indicating that there are limited circumstances in which the shipowner must act when a danger *arises* from a malfunction); *Keller v. United States*, 38 F.3d 16, 32 (1st Cir. 1994) (reiterating that the duty applies to "unsafe conditions" that had *developed* since turnover).

The decision of the Second Circuit in *Gravatt* further defines these two exceptions in the "dual capacity" context and holds that the negligent actions of a defendant's employees must be analyzed to determine whether they were undertaken in pursuance of its role as vessel owner or as employer.  As the Second Circuit explained, the alternative–mechanically applying the active control duty and the duty to intervene in the "dual capacity" context–would actually undermine the intent of Congress that the availability of a negligence action against the vessel owner should not depend on whether the vessel is owned by a third party or by the employer:

The relationship [between the immunity of a "dual capacity" defendant in its "employer" capacity and potential liability in its "owner" capacity] seems clear as to the first prong of the *Scindia* duties-the "turnover duty."  If because of negligence of the ship's crew, the vessel's equipment is faulty, or hidden dangers beset the contracted operation, so that an experienced contractor could not safely carry out its operations, such negligence would seem to constitute negligence in the capacity as vessel and render the ship liable whether the contracting operations were carried out by an independent stevedore or by the same entity as owns the vessel.

The application of *Scindia*'s second and third prongs-the active control duty and the duty to intervene upon actual knowledge-to the circumstance where the harbor-work contractor and the owner of the vessel are the same entity is more problematic.  Where the contracted service is performed by employees of the entity that owns the vessel, by definition the vessel owner would have "actively involved" itself in the operation and would have "actual knowledge" of the failure of the personnel undertaking the task to operate in a manner that protected their coworkers from danger.  Thus, if any "active control" or "actual knowledge" on the part of the dual-capacity defendant were sufficient to constitute actionable negligence under section 905(b)-regardless whether the defendant took control or had knowledge in its employer capacity or its vessel capacity-the availability of a tort remedy against the vessel would turn on whether the harbor-working operations were performed by a contractor independent of the vessel or by the same entity that owned the vessel-except. . . .  Harbor-working employees . . . . would have more expansive tort remedies if employed by a dual-capacity employer-vessel owner than they would have if employed by an independent contractor.  By the same token, the dual-capacity employer-vessel owner would have greater liabilities than if the work arrangement involved a single-capacity employer and a third-party vessel.

This result would be contrary to the express intent of Congress, which sought generally in drafting section 905(b) to provide the same result regardless whether the covered work was performed by an independent contractor or by the ship through personnel it hired directly to perform it.

226 F.3d at 122-123 (citation omitted) (footnotes omitted).  For this reason, the court set forth a cogent analytical framework to distinguish between the employer responsibility and vessel responsibility:

Liability in vessel negligence under section 905(b) will only lie where the dual-capacity defendant breached its duties of care while acting in its capacity as vessel owner.  The negligent actions of a dual-capacity

21

defendant's employees must be analyzed to determine whether they were undertaken in pursuance of the defendant's role as vessel owner or as employer. The negligence of the employer's agents, acting in tasks constituting harbor-work employment, may not be imputed to their employer in its capacity as vessel owner.[8]

*Id.* at 124-125 (footnote omitted).

In *Gravatt*, a journeyman dock builder, who was employed by a construction contractor retained by the City of New York to repair one of its bridges, was injured while working on a barge chartered by the contractor at a construction site. 226 F.3d at 111. Normally, his duties did not include handling materials on the barges, but, on the day of his injury, he was instructed by the site foreman to go onto a materials barge to help move old piles so as to clear access to new materials in an unsafe and negligent manner. *Id.* at 113. He was subsequently hit by a pile that was being moved by personnel working on the crane barge and knocked into the water, causing serious injuries. *Id.*

On review, the Second Circuit applied its analytical framework and assessed whether the employees' negligent conduct was undertaken in pursuance of the contractor's role as vessel owner or as employer. In so doing, the court noted that the task of the materials barge, as a vessel, was to transport building materials from Newark to the work

---

[8] Plaintiff relies upon the Sixth Circuit's decision in *Robertson v. Jeffboat, Inc.*, 651 F.2d 434 (6th Cir. 1981) to effectively refute the rule that the knowledge of a "dual capacity" defendant in its role as employer may not be imputed to its role as owner. However, the procedural history of that case eradicates its precedential value, at least with respect to its underlying logic.

In *Robertson*, the Sixth Circuit stated that, "[b]ecause Jeffboat is both owner and employer, any knowledge chargeable to it as employer must also be attributed to it as owner. What the employer knew, the owner knew." *Id.* at 436. The Supreme Court, though, subsequently vacated judgment in that case and remanded to the circuit for further consideration in light of *Jones & Laughlin*. *Jeffboat, Inc. v. Robertson*, 463 U.S. 1201 (1983). The Sixth Circuit's rationale in *Robertson*, then, is no longer good law, even though the court reinstated the judgment–without opinion–on remand. *Robertson v. Jeffboat, Inc.*, 722 F.2d 742 (6th Cir. 1983); *see also Dietlin*, 779 F.2d 50 (deeming the facts more akin to the circumstances underlying *Castorina* than *Robertson*).

site and to transport debris from the work site to Newark, while the work assigned to the foreman and to the injured dock builder was to make repairs to the bridge, which included the unloading of construction materials brought by the barges and the reloading of the barges with debris. *Id.* at 125. Moreover, all of the personnel working on the crane barge were engaged in bridge repair; none was engaged in seafaring work. *Id.* at 126. Simply put, "[n]either the materials barge, nor the crane barge, nor anybody present at the bridge repair site was engaged in vessel duties at the time of the accident," so the court held that the contractor was negligent in its capacity as employer, but not as a vessel owner. *Id.* at 125.

The facts of this case are akin to the circumstances underlying *Gravatt*. Much like *Gravatt*, Plaintiff was injured on a barge owned by his employer while moving materials, and there is no evidence that any of the personnel working on the barge were "engaged in seafaring work." More importantly, the work assigned to him involved construction and welding, which includes storing material pertaining to those tasks.[9] Simply put, the evidence shows that neither Plaintiff nor Lemons was engaged in vessel duties at the time of the accident.[10]

---

[9]  This conclusion–that Plaintiff was storing the leads pursuant to his construction and welding duties–is further supported by his expert witness, Larry Liberatore, who testified that "the activities he was doing, performing at the time of the accident were activities associated with the construction activity." (Doc. # 77-1, at 57-58). There is simply no other evidence to yield a contrary conclusion, and, frankly, this Court would have to stretch the boundaries of common sense to even contemplate that a welder was storing welding leads for some other purpose besides welding.

[10]  Plaintiff contends that Rodney Lemons was also acting as an agent of Southern Marine qua vessel owner. In support, he notes that Lemons had sent Plaintiff into the basement to dispose of rusted material in the basement during the "Mountaineer" project, which he argues benefitted the vessel–not the construction project.

This argument fails for two reasons. First, it ignores that vessel owners may rely on

Alternatively, even if this Court were to apply *Scindia* mechanically, there is no evidence from which a reasonable jury could conclude that Southern Marine qua vessel owner violated either the active control duty or the duty to intervene.  *Gravatt*, 226 F.3d at 128, n.18.  With respect to the active control duty, Plaintiff has set forth no evidence that the basement remained under the active control of Southern Marine qua vessel owner, or that the hypothetical company actively involved itself in the construction project. Furthermore, as to the duty to intervene, all of the evidence herein indicates that the basement was in its complained-of condition *prior* to turnover.  *See Scindia* and *Keller, supra* (recognizing that the duty to intervene only concerns dangerous conditions that arise *after* the vessel has been turned over to the employer).

Because there is no evidence that Southern Marine qua vessel owner breached any *Scindia* duty, Defendant's Motion for Summary Judgment (Doc. # 84) is **GRANTED**.

## V.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff has also moved for summary judgment, as he contends that there is no genuine issue of material fact regarding Southern Marine's violation of the *Scindia* duties. However, because the Court agrees with Southern Marine that it is entitled to summary judgment, Plaintiff's Motion for Summary Judgment (Doc. # 80) is **DENIED**.

## VI.   CONCLUSION

For the reasons stated,

**IT IS ORDERED** as follows**:**

---

employers to avoid exposing their employees to unreasonable hazards, which includes remedying such hazards.  Second, even if this Court agreed with Plaintiff's characterization, it would be counterintuitive to conclude that Lemons instructed Plaintiff to store construction material in anything other than his construction superintendent capacity.  Lemons' earlier instruction to Plaintiff has no bearing this analysis, especially since it was given during a previous project.

(1)     Defendant's Motion for Summary Judgment (Doc. # 84) is **GRANTED**;

(2)     Plaintiff's Motion for Summary Judgment (Doc. # 80) is **DENIED**;

(3)     Plaintiff's claim for injuries and damages pursuant to Southern Marine's role as vessel owner is **DISMISSED WITH PREJUDICE**.

(4)     Plaintiff's Motion to Exclude the Testimony of Defense Expert John Whiteley (Doc. # 99), Motion in Limine to Exclude the Testimony of Mike Martin (Doc. # 100), and Motion to Exclude the Testimony of Defense Vocational Expert Barrett (Doc. # 118) are **DENIED AS MOOT**; and

(5)     This matter is hereby **STRICKEN** from the docket of the Court;

(6)     A Judgment in favor of Defendant will be entered contemporaneously herewith.

This 17th day of January, 2013.



**Signed By:**

*__David L. Bunning__*   *DB*

**United States District Judge**

G:\DATA\Opinions\Covington\2010\10-7 MOO Granting MSJ.wpd

25